Good afternoon, Your Honors. May it please the Court, I'm Michael Popock. I'm here on behalf of PlayUp U.S., the appellant on our appeal of a district court's denial of a preliminary injunction back in January for the breach of employment agreement covenants on non-disparagement, negative light, and still ongoing conduct related to it. Your Honors, I'd like to reserve three minutes for rebuttal. I'm not sure that seems to matter today, but I'd like to at least put that marker down. And I had the pleasure, the distinct pleasure of being at the Ninth Circuit for the first time today and listening to other advocates. And I will tell you that this is not about bankruptcy. This is not about immigration. This is not about codes. This is about a garden variety employment agreement, a rogue CEO, and things that she did while she was still employed that we have outlined in our brief and in the record, and that was before Judge Navarro in the District of Nevada, when she was considering the preliminary injunction. And we asked this, we think this case presents a classic Cutrell case under Winter, that the Court failed to at least address the serious question sliding scale variant in balancing and finding that there was at least the serious question as to success on the merits and a balance of equity sharply tipping towards my client, which represents reversible error. The serious questions test is a sliding scale test that doesn't come into play unless it's first demonstrated that the balance of hardships tips sharply in favor of your client. I think, yes, Your Honor, I totally agree with that. So my question is, I'm sort of curious, what exactly is your assessment of the irreparable harm and the balance of hardships vis-a-vis the injunction, that is granting the injunction and not granting the injunction? As I understand it, Ms. Mintis had, she left the employee, right, to play up at the end of her contract? Right, but all the activities or 99% of the activities we allege happened while she was still the CEO. No, I understand what I'm trying to get at is what was the risk of her doing these very vicious things that you accuse her about to do to go public and try to burn the whole house down and go to the, there was a period of time when she left the employee between the time of hearing on the injunction, which is a little over a month, like a month and a half, correct? Is there anything in the record that shows she took some steps to go out when she was left the employee that she started sending out, you know, missives, went to the regulators? Is there anything in the evidence to show, other than what her telephone call was with the lawyer saying I'm going to take this down to the ground and take them into bankruptcy, is there anything that shows she did anything in the record? Yes, your honor, when the suit was filed in December, even after December, as the record reveals, she continued to write emails and make contact with the major, one of the major investors in the case and make similar threats. Well, but I read a lot of those those emails back and forth and it really is about this, her view of what happened and who's to blame versus the other view. It was, it seemed to me, most of it was about the merits of whether, you know, she was to blame or Mr. Simic was the one who screwed it up by trying to leverage in the Australia thing and all that sort of stuff. It was very intense, it was heated, and she's putting the blame on him, but the stuff that's most damning is her conversation with the attorney when he, I guess, he called and she said, she started off with that and she started saying, you know, I'm going to take these steps and what I want to know is, was there any evidence that she actually did anything in the month and a half? Well, okay, so we have before that, it's not just the lawyer that she's, that she says she's going to burn the company down, she's going to take its licenses, she's going to run it into bankruptcy, she's going to turn off its lights, she's going to turn in, turn them into the regulators. She does that with Mr. Simic, she does that with Farshad Amirbajani, who's a lawyer in Australia who represents the company, the parent company's an Australian company. She does it with investors, she calls Mr. Simic a fraud. She uses in an extortive way that if they, at least until she, the contract expired, that if she doesn't get her contract, she's going to do the following things. Now, I've had the benefit of... Were all those conversations part of her job as CEO though? No, I think they're all rogue and outside of her, outside her- Her role is not to talk to investors? To tell them that she believes that the CEO of the company has committed, is a fraud and has committed fraud and was blacklisted when he was not, to say things that are untrue and fraudulent? No, I don't think that's part of her job. I mean, but communications with investors in general is part of her job though. It actually isn't. I mean, if you look at her job description, she is a regional or US CEO who reports to a global CEO who reports to a board at a public company sitting in Australia. One of her jobs is not generally fundraising. In fact, she did very little of that. That was really left for the Australians to help bring in the money, which included FTX, which they originated, not her. She did that as we've alleged in all of the six different declarations that she did that in an extortive way in order to leverage a better, more power, more money, more equity in the company. That the things that were just mentioned by Judge Chen were not done with a pure heart and a pure mind because she was the CEO. She did it for a particular reason. You can plot on a graph her negotiation tactics versus the FTX issue where she, as we've alleged, was the arsonist fireman where she said, basically she strangled the golden goose and then killed it and then claimed that she wanted to- That goose is dead now, right? Well, I mean, I can't go beyond the record. We've had six months of discovery in this case. But the record, as far as we know, that goose is dead. So looking forward, that's what a preliminary injunction is for. Is it bad as all those things were and you may have a claim for damages, et cetera, et cetera. Which we do. The thing is looking forward. Do you need an Well, I mean- What did she do besides make these threats to various people? Well, Judge Chen, I'm in a difficult position because I'm trying to stay within the record. Well, I'm asking you in the record. Yeah. Well, in the record, as it was developed before I became the counsel in the case, that's sort of static. After the case was filed and after the injunctions were served, both in Australia, a case was started in Australia because she was a fiduciary as a board member of a public company as well as CEO fiduciary in Nevada. She continued to make these contacts, not for the purposes of her job description, but for the purposes of continuing to try to get back into the good graces of the company and get her job back. I mean, she's scrambling back now- But she wasn't going out to burn the house down. She wanted to get her job back. Well, I don't know what... Again, I have to be careful because I'm trying to stay within the record. Within the time period, remember, the record stops at the hearing in January. So I really... I can just tell you from a serious questions standpoint, the serious questions should have been properly evaluated by Judge Navarro. I'm asking about the balance of hardships because you don't get the serious questions unless you show they tip. Well, they certainly... In January, they certainly tipped substantially to us. We have the loss of FTX as a $450 million acquisition. That's a past loss. What you look at is what is the harm to you, your client, in not getting an injunction? That's the question going forward. Because the investor market, there's an overhang on the investor market. This company, if it doesn't resolve this issue and this court doesn't find that Judge Navarro made a mistake, then the overhang is that Mr. Simic did something wrong, then they can't get future investors. I mean, right now, pardon me- Well, the injunction doesn't require corrective statements or admission of wrong by- No, we just want to shut her down from doing anything that continues to harm the company. All the stuff she said is still theirs. I'm asking, what is the benefit of a forward-looking injunction to your client? That's what I'm struggling with. Yeah, because the continued operations of the company and the investing market, because this company doesn't continue to survive without future investment, to allow a former employee to continue to go rogue and breach her covenants that she believes in a false light, means they can't, just to continue the inference- Which is why I'm asking, what is the evidence in the record that she was doing those things that required an injunction? That she continued to do those things after she left? Well, right up until the hearing, there is evidence that, and it's in our record, I'll give you the citations, Your Honor. There's evidence that even after having the case filed against her and the month time, she continued to contact investors. She continued to contact board members who were independent in an effort to try to, and in breach of her fiduciary duty as a, well, at that point, a breach of her covenant, a restrictive covenant that she signed that she would not disparage the company or conduct herself in that way. But weren't those contacts about disparaging Mr. Mimic and what he had done and why they're going the wrong direction, what it takes to get this back on track? Well, no. The disparagement or putting the company in a false light is a few things. One, saying that the company had been blacklisted when it hadn't been. Saying that Mr. Simic had committed some sort of undefined fraud when he hadn't. To say that he is the reason that FTX walked away from the deal. I can't go into discovery that we've discovered after that, but that was not a proper position to take. These things after she was terminated as CEO, or contract- For obvious reasons. So the balance of hardship, to hopefully answer the question, the balance of hardship continues because- Well, it doesn't, unless you presume that your side prevails on the merits. It seems to me, I really don't understand the premise of any of these other arguments if you don't prevail on the merits. If you don't prevail on the merits, then the hardships tip the other way. The irreparable harm would tip the other way from the injunction. The public interest would tip the other way. I don't really understand the argument that the whole game isn't tied up on likelihood of success and that serious questions should be enough. How can the other boxes be checked off unless your side has a likelihood of success? I think, I think Winter Cottrell says exactly that. No, no, no, it doesn't. It doesn't. Because Cottrell is an environmental case where they're concerned about the national forest is going to be cut down. We've got another case, the death penalty case. I think it was Lopez. This case, this is a contract case. You don't usually get injunctions in a contract case. You get breach of contract remedies, and you're pursuing those. Well, but in a restrictive covenants, you often get injunctions. I mean- Well, not all that you sometimes, but not routinely. I mean, back in the day, I was involved in a good number of those cases, and judges were understandably skeptical. This is all about money in the end. You'll go fight about money later. It seems to me that with regard to injunctive relief, it starts and effectively ends with likelihood of success. Because if it is not likely your client succeeds, how can the other boxes be checked off, especially the one Judge Chen has picked up, ships, tips sharply in favor? But our position is that Judge Navarro did not properly address. She short-circuited the- Stop. I'm saying I think Judge Navarro focused on likelihood of success, decided that box wasn't satisfied, and you don't need to reach the others in this case. So tell me why you do need to reach them. How can it be the case, if your client doesn't prevail on the merits in the end, that the other factors can be satisfied? In the Ramos case, this court said in 2020 that a party seeking preliminary injunction must meet one of two variants. I understand we're- No, no, no, no. I know the alternative route is there. I mean, in cases where we applied the alternative route, the facts of this case don't seem to me to permit that route. It's not a forest that's going to be cut down. It's not a death penalty protocol that's going to be So if you don't win in the end on the merits, and Judge Navarro appeared to say, I don't see likelihood of success here, then how can you win an injunction based on these other factors? Well, we've argued in the briefing that we think it's a de novo review that she did not- Even though Cottrell came up on environmental, I know the background of the case. However, it doesn't only apply to environmental. I think she had to do- In the death penalty protocol case, sure, I get that. But it doesn't tell me why in this case, if you don't have a likelihood of success on the merits, how can you establish that the balance of hardship tips sharply in your favor, that irreparable harm and all- But trial counsel argued to Judge Navarro, there's one of two ways for me to satisfy the success on the merits prong. You have to look at either one, not one to the exclusion of the other. That's what the briefing, I think, is wrong about. When they said, well, she chose one and went that route, but they argued two- And I'm posing a different question to you. Why do you have the alternative route on these facts if you can't establish likelihood of success on the merits? I don't think you can. I'm putting that to you squarely. Explain to me how you can have irreparable harm or balance of hardship or public interest. How can you prevail on those boxes, especially under a sliding scale in extreme or tip sharply if you're not likely to succeed on the merits? But why isn't the proper analysis that at least- You're not answering my question, are you? No, I am. I want- Okay. I'm eager for it. Okay. I think that the evidence that was presented, the six declarations, the 15 times she breached the covenant with third parties and independent people, and all the statements that were made, which is our preponderance of the evidence standard, at least raised a serious question that should- No. That should- Because if you don't prevail on the merits, you can't check off the other boxes. That's the question I've posed. Now, you can challenge whether she was right in deciding that there was no likelihood of success on the merits, and that's what you're trying to do. But it doesn't actually answer the question I've posed, which is if you don't establish likelihood of success on the merits, why did the other factors matter? And so far, you have not given me an answer to that question. Yeah. Well, I think in our briefing, and I'll do it here again, the likelihood of success on the merits analysis was wrong by Judge Navarro. She abused her discretion. I also think she's wrong on the law because I think she either had to look at of the serious question plus balance of equities. Why? Why? If you can't answer the question I've posed, then I haven't heard an answer to that question after asking it about five times. You can tell me all the theory you want, but if, in fact, you don't have a likelihood of success on the merits, how can you possibly have a balance of hardship tipping sharply in your favor? How can you possibly have irreparable injury? You don't. Well, then the court's deciding that the serious question test plus balance of equities almost never applies in a contract case. Yeah, that sounds good to me because you usually don't get injunctive relief in a contract case. But I don't think that's the precedent that I've seen in the Ninth Circuit. But I think the bottom line is here, your claim of hardship, your claim of irreparable harm isn't extremely tied up with the merits because you're wrong on the merits. All she's doing is not harm. I mean, your argument is it's not like the forest or death penalty or something. It's tied up. I have to have a violation of the covenant or a fiduciary duty breach, which was also argued. Right. And that's why in this case, maybe it's not true in all cases, that's why we do have the variant. But in this case, it seems like it sort of collapses, that you have to show a likelihood of success in order to show the irreparable harm, the balance of hardships. It's a bit circular, I admit. But this is one of those cases where it seems to be the case. Then for us, our argument then, it sounds like the Ninth, this panel is moving towards making a declaration that you'll never be able to use serious question if you're in a kind of a garden variety restrictive covenant non-compete case. I just don't think that's the proper pronouncement of the law. That's not the way we argued it. That's not the way the precedent shakes out. Because I think on the likelihood of success on the merits, she had an overwhelming amount of evidence in front of her. And we think she abused her discretion by not doing it. But we still think it's also either a de novo or abuse of discretion for her to have not at least considered, not that it was a tie goes to the runner between Mintus and Simic, but that there was a serious question. We'll give you some time for rebuttal. But at least there was a serious question and let it go to litigation and issue the injunction in order to keep the status quo. Ms. Brasher, whenever you're ready. Thank you. Good afternoon, your honors. Opposing counsel, Jennifer Brasher for Dr. Layla Mintus. May it please the court. We ask that you affirm the decision of the district court denying playups motion for preliminary injunction. The district court appropriately and in applying Ninth Circuit law found that plaintiff failed to demonstrate a breach of the non-disparagement provision in the employment agreement. And that ties directly what your honors were questioning counsel about a little while ago. That provision prevented Dr. Mintus from disparaging playup to press, to media and business relations. There is nothing in the record to suggest that Dr. Mintus disparaged playup to the press, to the media. The only business relations scenario that we have is the potential deal with the potential buyer that fell apart. That, as Judge Chen noted, would be a situation which you have damages for. That deal based on the record has fallen through. And I will say, your honor, there's nothing in the record, your honors, to suggest that Dr. Mintus did contact anyone after her employment agreement expired. There's also nothing in the record to say that she said the company was blacklisted. Dr. Mintus expressed concerns over Mr. Simic being blacklisted based on information she was giving. Not the company, your honors. And I do want to point out that the court did also appropriately find that Mintus was exercising her executive responsibility, which ties into another question asked by your honors. Is that, yes, she was the CEO of the United States company, PlayUp Inc. But importantly, your honors, she was also a board member of the parent company. She did have those duties. And as the court found, she was exercising her executive responsibility and turned into a scapegoat. Also, based on her employment agreement, fundraising was part of her employment. And that is, in the record, I believe it's 414 to 464. The district court did not abuse its discretion or make clearly erroneous findings of fact. It elaborated on its findings on the record, basically stating that it was just as likely or more likely that the global CEO, Mr. Simic, is the one that caused the deal for the negotiations of the sale to, quote unquote, cease irreparably. And your honors, the court references an email from that potential buyer to certain board members, including Mr. Simic. That email was subsequently provided to Dr. Mintus by another board member. PlayUp and all of its motion- Counsel, I'm sorry to interrupt, but if she made misstatements to investors, would that be a violation of the restriction? No, your honors. And based on the supposition that she made misstatements, which obviously we disagree with, which goes to the likelihood of success of the merits, even admitted by the counsel at the hearing is that all the affidavits and the information was based on insiders and the statements were made to shareholders on the board of directors. And that was, forgive me, your honor, I can find that citation in a minute. So, no, I would argue that's not a violation of the disparagement provision. Because it was made- All the investors that she directed her communications to were members of the board? The majority one was, yes, a member of the board. They conceded at the lower court that the shareholders on the board of directors, and that was in the transcript. She didn't make a disparaging comment with respect to the company. Her concerns all rose to the level of her exercising her executive responsibility and being concerned about the deal falling apart. And that deal fell apart due to the actions of the global CEO. And your honors don't- Well, fortunately, your honors aren't determining the fact issue here, but we have that email from the potential buyer that they withheld. And it's important, as the district court came up with its ruling, the district court states, and I quote, this is not a surprise. This is information that existed that was not provided to the court. It was definitely relevant to the issue at hand and does certainly place things in a different light. Playup withheld that email from the third party. And that is the only piece of evidence that is from a third party and Playup did not provide to the court. Playup stated the reasons it did not provide it to the court was because it felt it was a confidential email. Respectfully, that excuse rings hollow. Playup had previously filed items under seal. They chose not to present that email to the court. They made that conscious decision to withhold it. And it's understood why, because that email supports the fact that Mr. Simic had asked for additional concessions for himself. He raised that with Dr. Mintus before he met with the potential buyer, stating he wanted approximately $170 million more for himself and for those aligned with him, which unbeknownst to Dr. Mintus at the time did include other members of the board. The reasons the potential buyer passed on the deal as set forth in the buyer's email was the fact that there was a conflict with one of those other companies that Mr. Simic wanted additional money for. And there's also other employees that Mr. Simic wanted money for that didn't feel, for lack of a better term, they weren't worth the value that he sought. They withheld that email that Mr. Simic sent to Dr. Mintus as well. And your honors, it would be frightening if she didn't get a copy of those emails because we might be in a different situation right now. Based on the affidavits that, again, counsel admitted at the hearing were all from insiders or shareholders on the board of directors. Counsel, can you address the opposing counsel's argument that there was evidence that Ms. Mintus continued to disparage the company to investors after her contract was expired? Correct. Yes, your honor. And I will say that that is not in the record. What is in the record is Dr. Mintus had expressed her concerns over the deal, but importantly, at the same time... To who? To one of the investors. But after she was CEO at that point? Yes, because what is important to this is that they filed their complaint and the request for a TRO on November 30th. After November 30th, PlayUp Inc., while telling the district court that Dr. Mintus was disparaging the company and we had to get an emergency TRO right away, they continued to negotiate with her for the extension of her contract. So this was within the communications having to do with the extension of her contract. So at the same time, they're saying, this woman respectfully needs to be gagged. We want to bring her on and continue her on as a CEO. And that is in the record. So if I understand your argument, she did speak to an investor after she was CEO, but that does not violate the disparagement clause. What she told to an investor in the email communications was the concerns over the deal falling through and the need for her to come back on as a CEO because that was a material term of the acquisition to stay on as a CEO to make the deal go through, to basically effectively save the deal so the shareholders were not going to be out millions of dollars. Mr. Simic already had threats of shareholder lawsuits going on at the time, including by this one gentleman investor who basically said it's time to get Layla her contract. Stop airing your dirty laundry, Mr. Simic. Get her the contract. Multiple board members submitted proposals after November 30th, after the date and time that they filed the request for a TRO, multiple board members still set forth proposals to have her stay on as the CEO of the United States. Do you have the record site for that communication with the investor that you just referred to? Yeah, I have a few citations, Your Honor. Excerpts of record at 4-11 is a board member, Mr. Drazen, saying I will try to finalize your contract. Then there's also from 4-1-4 to 6-4, there's the slew of the emails that post-date December 1st, 2021 that all go through her efforts to obtain a new contract, the discussions back and forth. Importantly, she actually states to PlayUp on excerpts of record 4-20 that she's holding off telling people, i.e. people outside the company, that she's no longer with PlayUp because she didn't want to harm the company. These communications are with board members or just general investors? Board members and there's one investor that's in that slew of emails, yes. And that investor is just an interested investor, not a board member? Correct, Your Honor. Actually, Mr. Simic also brought him in. They've referred to him in the pleadings and in the papers as an advisor and referred to him effectively as an insider because he is an advisor to the company as well. Also, I will say at excerpts of record 7-93, PlayUp was to hold a board meeting. On that agenda, you will see multiple proposals that were to keep Dr. Mintis on as a CEO. That's also at excerpts of record 12-30 and 31. So again, these are not actions of a company that's concerned with disparagement because at the same time, they're going to get the TRO. They're negotiating to keep her on as the CEO of the company. But it sounds like the allegedly despairing communications, the other side would say were disparaging, went to either board members or one investor who was, quote, an advisor, i.e. the insiders, not to the general investing public. Is that correct? Yes, Your Honor. Okay. So again, based on the disparagement provision, she was not disparaging the company to business relations of the company. The only evidence that they have of that is the email, or excuse me, that we have is the email with the potential buyer. And they highlighted in that email, the reasons they passed on the deal were because Mr. Simic effectively sought an additional $170 million for himself. He did have those threats of shareholder lawsuits, one of which was by the same gentleman investor who was the advisor. And he knew they had to figure out a scapegoat to deal with this. And that scapegoat was Dr. Mintis. Ultimately, under Winter or the sliding scale, they cannot establish either a likelihood or reasonable probability of success on the merits, even if you go to the sliding scale approach. I would argue, Your Honors, that the court did effectively, well, based on the court's findings, let's set aside the balance of hardships issue, it wouldn't even satisfy a reasonable probability because the court found that plaintiff did not otherwise provide evidence that the defendant even likely made disparaging comments to the potential buyer. And she was exercising her executive responsibility because again, she is a board member of the board of the parent company. She has her own obligations. And she could not see these acts going on. It was effectively trying to save the company. As stated, the potential buyer, one of the terms of the deal going forward was Dr. Mintis staying on as the CEO. So it wasn't simply a matter of my contract expired. I'm trying to get this deal for myself. It's my contract expired. This is a deal point because the buyer was very interested, mostly interested in the United States business. Additionally, there is no motive or any suggestion for why Dr. Mintis would want to see this company fail. It's very important to note, which is in the record, that she invested $1.2 million of her own money into this company. She did not take a salary for an entire year with this company. Her motive was to see the company succeed. And we have attached, while they say there was only a sole declaration of Dr. Mintis in opposition, we have 100 pages of communications which demonstrate not just that they have not met their burden, but also the falsity of the statements made by Planned in those affidavits. So it was perfectly appropriate for the court to consider those affidavits with the counter evidence that we presented in text and email communications. And with respect to this commentary that Dr. Mintis made a statement about burning the company down, she has refuted that in her declaration. There's not one piece of paper, not an email, not a message, not a WhatsApp message, a new... Every case I get, I learn new messaging services that they have out there. There's not one, not one in which she made the comment about burning the company to the ground. She did mention bankruptcy. Why? Because the concern is, I have $1.2 million in this company and what's going to happen at the end of the day? There could be effectively a bankruptcy. Nobody wants that. Can you describe... Counselor, we're running out of time, but I wanted you to describe what the harm to her is if an injunction were issued, because that's what the balance of hardships is about. And not what she suffered so far, but what she would suffer from an injunction. That's what I want to know. Effectively, what you would suffer from an injunction at this point in time is basically the inverse of what opposing counsel is arguing is that now at this point in time, she is going to be blacklisted. She has been in the media after they got their TRO and we have the news stories and we show that those news stories were even international. And those are at the end of the exorcist record, if I remember, serves 462 to 464. So with the granting of the injunction is a publicity that comes along with this. And your honors, if every time there's a non-disparagement provision in a contract, somebody can claim we just want to turn that into an injunction. That would turn that contract effectively into an injunction every time. Having to satisfy that likelihood of success. And again, I would go back to the fact with respect to the irreparable harm is that they continue to negotiate with her after they claim that she made all these statements and keep her on as the CEO. Multiple board members set forth proposals to keep her on as the CEO after they claim that she made all these disparaging comments. She held off telling people that she was leaving the company so as not to cause irreparable harm. The only harm that we have here right now is the situation in which this deal fell through. It's our position that that was caused by Mr. Simic. Playup has their counter argument. I understand that, but what would she do that she can't do if an injunction were issued? I would say that the extent the concern would be if an investor reaches out. I'm not saying and I don't. This is all hypothetical, obviously, future in time. Concerns over informing them what's going on with the company, what she's aware of going on. That type of concern, I would say that would be out there if the injunction were to issue. Effectively, they can use it to gag her and then report to the media whatever they would like to do regarding this lawsuit. All the while, she would have concerns that anything she could say could be argued contempt of a court order. And so they would have that upper hand and it's being played out in the media. And we had cited to those news stories in the briefs. She would be bound by a sense a gag order while the other side can say what they want. That's correct, Your Honor. And that's what happened at the beginning. And so going to that, and again, she is the one and we have this in her declaration, had not been able to find any further employment. I know my time is up. She thought she was getting a contract extension at that point in time. And at the time of the hearing that there was no future employment due to the news stories that were out there and what people had informed her, she's untouchable at that point in time based on that. And with that, we would respectfully request that the court affirm the district court's ruling as the district court did not abuse its discretion in denying the requested preliminary injunction. Thank you. Thank you, counsel. Mr. Popak, we'll give you two minutes. Firstly, the restrictive covenant that's at issue here has been misstated by Ms. Braster. I want to make sure it's clear for the record. 6E of the contract is two prong, not one prong. It says the executive shall not in any communications with the press or other media or in any communications with any business relation of the company criticize, ridicule, or make any statement which disparages or is derogatory and shall not engage in any form of conduct or make any statements or representations that disparage, portray in a negative light or otherwise impair the reputation or commercial interest of the company, subsidiaries, or any of its officers. It's two prong. There's no extra requirement that they be insiders or outsiders. And this definition that my opposing counsel is using, it does not reside in the agreement itself. Are you saying this prevents her from talking to other members of the board of directors about her understanding of what's going on at the company? It stops her from criticizing, ridiculing, or making any statement which disparages or is derogatory. How could that possibly be enforceable? Her obligation as a director would compel her if she knew something nefarious was going on to speak up. Yeah, we're not talking about the board members. We're talking about the outside investors, which we have plenty of record evidence that Todd Buckingham at BetMakers, which is a major investors, that Matt Davies, these were all outside investors that she took it upon herself to go and badmouth Mr. Simic, Mr. Costa, and other founders of the company, not because she had an obligation to do it, but because she was trying to extort a better contract for herself. So that goes, that's rogue, that's outside the boundaries, and that is exactly what you're not supposed to do in this agreement. I'm not talking about run-of-the-mill board meetings where you bring to the attention of somebody or you make a regulatory disclosure that she threatened but never made. The record is clear on that. So we're not trying to gag her from doing things within the tent while she's an employee. We're making her stop going out and doing all the things that she threatened to do, which is to take away our clients, our customers, our licenses, our business. She has the power to do that. She has the will to do that. She had the incentive to do that, hence the injunction. The fact that we're here in July... How does the injunction change anything in terms of your ultimate relief? You've got a breach of contract claim for violation of that covenant. Right. What's different about what you're seeking today and how you'd be able to enforce it? We have an enforceable, valid, and reasonable restrictive covenant that has been violated that also, under Nevada law, entitles us to an injunction. And that was what was bargained for. If now the law is going to be in the Ninth Circuit for Nevada law, that those kind of agreements that I heard my opposing counsel say this, you'll never be able to get an injunction for that because what is really the harm? Let's go to damages.  the contracting parties agreed to when they negotiated. Well, but I don't want to recycle our previous discussion, but I'm still trying to figure out, okay, at this point, with the contract having expired, what is... I mean, I heard from both sides a suggestion that the impact of our decision will be the perception of what we're saying about the underlying case. That is that it's going to be selling people that they're going to work or she's going to win. And that's not what we're trying. No, I don't want that. I just want an injunction to enforce a provision of the contract that Dr. Mintis signed to stop her from putting the company in a negative light, from disparaging it, to allow it to go about its business, continue to attract investors, and be a going concern without having a former employee, CEO of its company, violate all of those conditions. We'll take it up with Judge Navarro on damages, impunitive damages, on the development of discovery in this case. However, for these purposes, we are entitled to the injunction. And we think it was either under a de novo review, improper... Wrap it up, counsel. Thank you. Thank you, your honors. Thank you. Thank you very much, counsel. This day will be adjourned. The circuit will now depart. For this court, for this section, now is adjourned.
judges: CLIFTON, BUMATAY, Chen